UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION


FILED
MAY 01 2017

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| MEIERHENRY SARGENT LLP, a South Dakota limited liability partnership | |
| | CIV 16-4180 |
| Plaintiff, | |
| | MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION TO STAY ACTION AND COMPEL ARBITRATION |
| vs. | |
| BRADLEY WILLIAMS and KERRY WILLIAMS, | |
| Defendants. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Pending before the Court is Defendants' pre-answer Motion to Stay Action and Compel Arbitration for claims asserted in Count II of Plaintiff's Complaint pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, and Federal Rule of Civil Procedure 12(b)(1). Doc. 7. The motion has been fully briefed, and for the reasons set forth below, Defendants' motion will be granted.

## I. BACKGROUND

Although some disputed questions of fact remain, the Court accepts as true the following facts for purposes of this memorandum opinion and order. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original) (finding that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion [to compel arbitration]; the requirement is that there be no *genuine* issue of *material* fact.").

In 2015 and part of 2016, Defendants, residents of Mendota Heights, Minnesota, owned agricultural land in Lincoln County, South Dakota. During this time, Dakota Access, LLC ("Dakota Access") was attempting to acquire easements from landowners in various counties,

1

including Lincoln County, in order to build an oil pipeline.[1] In January of 2015, Defendants hired Plaintiff, a Sioux Falls, South Dakota law firm, to advise and consult with them about various legal matters related to the proposed pipeline ("First Hiring").[2] The First Hiring representation ended sometime before October of 2015.

In October of 2015, Dakota Access initiated an eminent domain action against Defendants. In December of 2015, Defendants retained Plaintiff to represent them in these proceedings ("Second Hiring"). Plaintiff and the Defendants entered into an Attorney Fee Contract ("Contract").[3] The Contract provided that the Defendants would pay Plaintiff one-third of the amount of settlement negotiated by the Plaintiff, less the $101,082.56 settlement offer negotiated by the Defendants prior to retaining Plaintiff.[4] The Contract also contained a "FEE ON TERMINATION" clause, which provided:

> **4. FEE ON TERMINATION.** If Client terminates Firm's employment before conclusion of the case without good cause, Client shall pay Firm a fee and expenses based on the fair and reasonable value of the services performed by Firm before termination. <u>If any disagreement arises about the termination fee, the client may choose two persons from a service profession, and the firm may choose one person. The firm will be bound by a majority decision of the three persons as to a fair fee.</u> If the Firm terminates the representation, then it shall receive no fee or expenses.[5]

During the approximately two months in which Plaintiff represented the Defendants, Plaintiff obtained a settlement offer from Dakota Access for $750,000. Thereinafter, on or about

---

[1] The proposed pipeline called for an approximate 3.41 acre easement across Defendants' land.
[2] *See* Compl., Exh. A (engagement letter).
[3] *See* Compl., Exh. B (Attorney Fee Contract).
[4] *Id.* at ¶ 2.B.

B. *Contingent Fee*. A contingent fee calculated as follow:

    STEP 1:    If the case is settled, start with the total settlement amount;

                  If the case is tried to a verdict, add together the amount of the verdict, and the amounts awarded by the Court for attorney fees, statutory disbursements and interest, if any;

    STEP 2:    Subtract the amount of the Pipeline Company's offer to purchase the property, which in this case is $101,082.56;

    STEP 3:    The attorney fee shall be 33 1/3 % of the amount remaining after deduction of the Pipeline Company's offer; plus gross receipts tax at the lawful rate at the time of payment.

[5] *Id.* at ¶ 4 (emphasis added).

March 8, 2016, the Defendants terminated Plaintiff's representation.[6] In the days following this termination, however, discussions continued between the parties.[7] On March 11, 2016, the Defendants emailed Plaintiff a revised contract proposal in which Plaintiff would be entitled to collect fees on a settlement that exceeded $950,000 and Plaintiff would be responsible for all of its expenses.[8] Plaintiff declined the alternative contract proposal.[9]

Over the next several months, Defendants continued negotiations with Dakota Access. Ultimately, Defendants sold the subject property in fee to Dakota Access.[10] On May 11, 2016, Plaintiff filed an Attorney's Lien in state court for $229,054.88 against Dakota Access and Defendants.[11] On June 14, 2016, Plaintiff emailed Defendants' new counsel, Edward Sheu, in an attempt to privately settle the attorney fee dispute.[12] On June 28, 2016, Attorney Sheu responded to Plaintiff's email by highlighting the procedure, as set forth in the Contract, to settle an attorney fee dispute, and noting the alleged deficiencies in Plaintiff's representation, specifically that if Plaintiff made a claim for recovery of legal fees it would be met with malpractice and ethics violations claims.[13]

On November 17, 2016, Plaintiff filed a two-count Complaint against Defendants in Minnehaha County state court. In its Complaint, Plaintiff alleged that it is due $593.60, plus interest and costs, for the First Hiring (Count I), and $216,305.81, plus interest and costs, for the Second Hiring (Count II).[14] On December 30, 2016, Defendants filed a timely notice of removal

---

[6] *See* Doc. 13-1 (March 4, 2016 email from Brad Williams to Chris Healy: "The engagement letter allows me to terminate the representation and pay you a fair and reasonable value of the services performed before termination. The letter also provides for a procedure in the event of a disagreement over the fees[.]"; March 8, 2016 email from Brad Williams to Chris Healy: "YOU ARE NO LONGER AUTHORIZED TO SPEAK TO DAKOTA ACCESS OR THEIR ATTORNEYS ON MY BEHALF. YOU ARE HEREBY INSTRUCTED . . . TO RE-DIRECT THEIR COMMUNICATIONS TO ME AND THE NEW COUNSEL I WILL SHORTLY BE DESIGNATING TO SUBSTITUTE FOR YOU.").
[7] *See* Doc. 13-2.
[8] *Id.* (March 11, 2016 email from Brad Williams to Mark Meierhenry: "During our call yesterday, you proposed continuing to work with me and my wife to get a deal done with Dakota Access. You asked me to provide you a net amount for the check that we want to receive from your trust account, if a deal can be done. The number we arrived at is $950,000.").
[9] There is disagreement among the parties as to whose idea it was to formulate a new contract arrangement. *See* Doc. 11 at ¶ 5 (Affidavit of Mark V. Meierhenry); Doc. 12 at 6 ("[O]n the March 10, 2016 call, Mr. Meierhenry (not Mr. Williams) proposed that the representation continue, with a new fee arrangement.").
[10] See Doc. 11-2 n.1 ("The Williamses ended up selling the subject property in fee to Dakota Access.").
[11] *See* Doc. 13-3; *see also* Doc. 13-4 (Attorney's Lien Cancellation) ("Claimant has learned that services of the lien occurred after Dakota Access had paid all sums to Williams and had received a deed from Williams and therefore, said lien is unenforceable against Dakota Access.").
[12] Doc. 11-1 ("We would prefer to resolve this matter privately rather than proceeding with court action.").
[13] *See* Doc. 11-2.
[14] Count II is the only count subject to a contractual arbitration clause and is the focus of this motion.

3

pursuant to 28 U.S.C. §1332. On January 6, 2017, Defendants filed the current motion requesting the Court to stay the action and compel arbitration of Count II pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, and Federal Rule of Civil Procedure 12(b)(1). In opposition to the motion, Plaintiff argues that Defendants repudiated the Contract, including the arbitration clause, and therefore the parties are no longer contractually bound to arbitrate.

## II. STANDARD OF REVIEW

The Federal Arbitration Act does not identify what evidentiary standard a party seeking to avoid arbitration must meet. *Neb. Mach. Co. v. Cargotec Solutions, LLC*, 762 F.3d 737, 741-42 (8th Cir. 2014); *see also Henry Techs. Holdings, LLC v. Giordano*, 2014 WL 3845870, at *3 (W.D. Wis. Aug. 5, 2014) ("The FAA does not define a standard for a district court's determination of a motion to compel arbitration[.]"). Courts that have addressed the issue have used a summary judgment standard. *Id.*; *see also Schwalm v. TCF Nat'l Bank*, 2016 WL 7468016, at *2 (D.S.D. Dec. 28, 2016); *Technetronics, Inc. v. Leybold-Graeus GmbH*, 1993 WL 197028, at *2 (E.D. Pa. June 9, 1993) ("[I]n a motion to stay proceedings and/or compel arbitration, the appropriate standard of review for the district court is the same standard used in resolving summary judgment motions pursuant to [Federal Rule of Civil Procedure] 56(c)."). Therefore, the court may consider all evidence in the record, viewing that evidence in the light most favorable to the non-moving party. *Id.*; *see also Lee v. Credit Acceptance Corp.*, 2015 WL 7176374, at *1 (W.D. Wis. Nov. 12, 2015).

## III. DISCUSSION

Through the Federal Arbitration Act ("FAA"), Congress sought to establish a strong federal policy favoring the enforcement of arbitration agreements. *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220 (1987). Enacted in 1925, the FAA's goal was to "revers[e] centuries of judicial hostility to arbitration agreements" by "plac[ing] arbitration agreements 'upon the same footing as other contracts.'" *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511 (1974) (quoting H.R. Rep. No. 97, 68th Cong., 1st Sess., 1, 2 (1924)); *see also Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010) (internal citations omitted) (finding that "[t]he FAA reflects the fundamental principle that arbitration is a matter of contract[,]" and thus "requires courts to enforce them according to their terms[.]"). Sections 3 and 4 of the FAA are key to the present motion. 9 U.S.C.A. §§ 3-4. Section 3 allows federal courts to stay proceedings of issues referable to arbitration. 9 U.S.C.A. § 3. Section 4 directs courts to compel the parties to

arbitration pursuant to the terms of their written arbitration agreement. 9 U.S.C. § 4; *see also Kubista v. Value Forward Network, LLC*, 2012 WL 2974675, at *2 (D.S.D. July 20, 2012).

By its terms, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217 (1985) (emphasis in original). "A court's role under the FAA is therefore limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute." *Pro Tech Indus., Inc. v. URS Corp.*, 377 F.3d 868, 871 (8th Cir. 2004). "If these requirements are met, the FAA allows the court to stay proceedings and compel the parties to arbitrate." *Precision Press, Inc. v. MLP U.S.A., Inc.*, 620 F. Supp. 2d 981, 989-90 (N.D. Iowa 2009).

*A. Whether state or federal law applies*

While the record before the Court demonstrates that the parties assume that the FAA is applicable in the present case, the Court must first answer the threshold question of whether state or federal law applies. *Id.* at 990.

"The construction of an agreement to arbitrate is governed by the FAA unless the agreement expressly provides that state law should govern." *Dominium Austin Partners, LLC v. Emerson*, 248 F.3d 720, 729 n.9 (8th Cir. 2001); *see also Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989) (finding that the FAA is a matter of consent, nor coercion, and does not prevent the enforcement of agreements to arbitrate under different rules than those set forth in the Act). Thus, the Court "will not interpret an arbitration agreement as precluding the application of the FAA unless the parties' intent that the agreement be so construed is abundantly clear." *UHC Mgmt., Co. v. Computer Sciences, Corp.*, 148 F.3d 992, 996-97 (8th Cir. 2001). In *UHC Mgmt.*, for example, the contract contained a choice-of-law clause, but the included arbitration agreement was silent as to whether state or federal arbitration law applied. *Id.* at 994, 997. In holding that the FAA was applicable, the Eight Circuit stated:

> The agreement makes no reference to the Minnesota Uniform Arbitration Act or to Minnesota case law interpreting the allocation of powers between arbitrators and courts. Moreover, the choice-of-law clause itself specifically provides that Minnesota law must yield whenever preempted by federal law, which cuts against the argument that the parties intended that the FAA not apply.

*Id.* at 997. As such, the Court could "divine no such intent [to preclude application of the FAA] from the language in the present agreement." *Id.* Similarly, in *Precision Press*, the court found that the "generic choice-of-law clause, that [wa]s utterly silent regarding state arbitration rules governing the agreement, as a matter of law, does not make the parties' intent to have federal courts apply state arbitration law 'abundantly clear.'" *Precision Press*, 620 F. Supp. 2d at 991 (quoting *UHC Mgmt.*, 148 F.3d at 997).

Here, the Contract does not contain a choice-of-law clause, and the arbitration agreement does not make any reference to either the FAA or state law to govern disputes. As such, in accordance with the above precedent, the Court finds that federal law, rather than state law, applies in the present case. *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 60 n.4 (1995) (finding that it is clear that the FAA does not have to be mentioned in either the contract or arbitration provision to apply). This does not end the Court's analysis, however. The Court must now consider whether the FAA applies to the Contract at issue. *See Precision Press*, 620 F. Supp. 2d at 992.

### B. Whether the FAA applies to the Contract

The FAA does not itself create federal jurisdiction and thus requires that an independent basis for federal court jurisdiction exists in order for the Act to apply. *See* 9 U.S.C § 4. Once the jurisdictional prerequisite is satisfied, the FAA is applicable where a written arbitration provision is part of "a contract evidencing a transaction involving commerce." 9 U.S.C. § 2.[15]

The words "involving commerce" have been broadly interpreted by the United States Supreme Court to mean "affecting commerce." *Allied-Bruce Terminix Int'l Co. v. Dobson*, 513 U.S. 265, 273-74 (1995) (holding that "the word 'involving,' like 'affecting,' signals an intent to exercise Congress' commerce power to the full."). The phrase "affecting commerce," then, indicates that Congress intended to regulate "to the outer limits of its authority under the Commerce Clause." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001) (citing *Allied-Bruce*, 513 U.S. at 277). "Because the statute provides for the enforcement of arbitration agreements within the full reach of the Commerce Clause, it is perfectly clear that the FAA encompasses a wider range of transactions than those actually in commerce—that is, within the

---

[15] Section 2 of the FAA provides, in part, "[a] written provision in any maritime transaction or a contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable . . . ." 9 U.S.C.A. § 2. By its terms, then, the FAA applies to (1) written agreements, (2) "involving commerce." *Id.*; *see also Southland Corp. v. Keating*, 465 U.S. 1 (1984). In the present case, there is no argument that the arbitration agreement was written. *See* Compl., Exh. B at ¶ 4. Therefore, the first requirement is met.

6

flow of interstate commerce." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) (internal quotation marks and citations omitted); *see also Circuit City Stores*, 532 U.S. at 111 ("[T]he FAA compels judicial enforcement of a wide range of written arbitration agreements.").

Determining whether a transaction involves interstate commerce requires a court to examine the contract, the complaint, and the surrounding facts. The broad authority of the FAA has been held to apply to employment contracts. *See id.* at 114-19 (holding that "the text of the FAA forecloses the construction of § 1 followed by the [Ninth Circuit] Court of Appeals in the case under review, a construction which would exclude all employment contracts from the FAA . . . . Section 1 exempts from the FAA only contracts of employment of transportation workers."). Specifically, various courts have found the FAA to apply to attorney fee agreements. *See G3 Analytics, LLC v. Hughes Socol Piers Resnick & DYM Ltd.*, 67 N.E.3d 940, 945 (Ill. App. Ct. 2016) (holding that "[t]he fee agreement was between parties from different states and contemplated potential False Claims Act litigation, under both state and federal law, in multiple jurisdictions. Because the fee agreement involves interstate commerce, the FAA, not Illinois law, governs."); *Hasco, Inc. v. Schuyler, Roche & Zwirner*, 981 F. Supp. 445, 449 (S.D.W. Va. 1997), *rev'd on other grounds*, 172 F.3d 43 (4th Cir. 1998) (finding that the FAA controlled "[g]iven the multistate nature of the parties' relationship, including (1) SRZ's performance of legal services primarily in Chicago for the West Virginia Plaintiffs; (2) the interstate travel of SRZ attorneys to West Virginia for court appearances; and (3) the parties' interstate communications, the Court has little difficulty concluding the retention letter evidences a transaction involving commerce."); *Default Proof Credit Card Sys., Inc. v. Friedland*, 992 So. 2d 442, 445 (Fla. Dist. Ct. App. 2008) (finding that the activities, which included, "representation by members of the Bar of different states, a question subject to federal interpretation under the FAA, enforcement of the patents on a national basis, signatories to the Agreement being located in different states and an Illinois contract to be enforced in Florida[,]" involved interstate commerce, and therefore the Contract's arbitration provision came within the scope of the FAA); *Lucey v. Meyer*, 736 S.E.2d 274 (S.C. Ct. App. 2012) (Employment contract between law firm and associate attorney, in which attorney was employed to work on specific cases identified in contract, involved interstate commerce, thereby triggering the FAA).

In the present case, the Court must first determine whether an independent basis for jurisdiction exists. *See* 9 U.S.C. § 4. Here, the Plaintiff is a Sioux Falls, South Dakota law firm,

7

and the Defendants are Minnesota residents. Defendants properly removed the action to federal court based on diversity jurisdiction. As such, an independent basis for jurisdiction is satisfied. Next, the Court must decide whether the arbitration clause is part of "a contract evidencing a transaction involving commerce." 9 U.S.C. § 2. Here, given both the broad authority of the FAA, and the nature of the parties' relationship, including, both parties' signatures on the Attorney Fee Contract, Plaintiff's performance of legal services in South Dakota for Minnesota residents, interstate travel of the Minnesota residents to South Dakota for various legal matters concerning the eminent domain action, and interstate communications, this Court concludes that the Contract evidences a transaction involving commerce and thus the FAA applies.

The Court must now determine whether the arbitration clause in the Contract constituted a valid arbitration agreement and whether the agreement encompasses the dispute at issue. *See Pro Tech*, 377 F.3d at 871("A court's role under the FAA is therefore limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute." ).

*C. Whether a valid agreement to arbitrate exists*

Under the FAA, state law contract principles govern the formation of an arbitration agreement. *See Patterson v. Tenet Healthcare, Inc.*, 113 F.3d 832, 834 (8th Cir. 1997) (internal citations omitted); *see also First Options of Chi. Inc. v. Kaplan*, 514 U.S. 938, 944 (1955) (finding that "[w]hen deciding whether the parties agreed to arbitrate a certain matter . . . , courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."). Under South Dakota law, the "elements essential to the existence of a contract are: (1) parties capable of contracting; (2) their consent; (3) a lawful object; and (4) sufficient cause or consideration." SDCL § 53-1-2.

Here, the Court finds—and the parties do not contest—that a valid agreement to arbitrate Count II exists under state-law contract principles. While not termed "Arbitration Agreement" in the Contract, case law demonstrates that no "magic words" are required, rather "[i]f the parties have agreed to submit a dispute for decision by a third party, they have agreed to arbitration." *AMF Inc. v. Brunswick Corp.*, 621 F. Supp. 456, 460 (E.D.N.Y. 1985); *Wolsey, Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205, 1208 (9th Cir. 1998). As such, the "Fee on Termination" clause contained in the Contract is a valid arbitration agreement.

### D. Whether the agreement encompasses the dispute

The Court will next decide whether the agreement encompasses the attorney fee dispute. *ProTech Indus., Inc.*, 377 F.3d at 871; *see also 3M Co. v. Amtex Sec., Inc.*, 542 F.3d 1193, 1198-99 (8th Cir. 2008) (finding that "the court rather than the arbitrator will determine whether a particular dispute falls within the scope of the clause."). In determining whether claims come within the scope of an arbitration provision, the court does not reach the merits of any claim, but rather liberally construes the scope of the agreement, resolving any doubts in favor of arbitration. *3M Co.*, 542 F.3d at 1199. The party resisting arbitration "bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91 (2000).

In the present case, Plaintiff argues that Defendants repudiated the Contract, which in turn repudiated the arbitration clause, through their words and conduct, specifically the termination of representation coupled with threats of filing legal malpractice and ethics violations claims, and therefore the parties are no longer contractually bound to arbitrate.[16] In support of its argument, Plaintiff cites to *Brown v. Dillard's, Inc.*, 430 F.3d 1004 (9th Cir. 2005). In *Brown*, Brown was fired from Dillard's and thereinafter sought to compel arbitration. *Id.* at 1005. Dillard's refused to participate in the arbitration proceedings. *Id.* Brown then filed suit in state court. *Id.* at 1005-06. Dillard's removed the suit to federal court and moved to compel arbitration. *Id.* at 1006. The District Court denied the motion and Dillard's appealed. *Id.* On appeal, the Ninth Circuit held that Dillard's had waived its right to arbitrate "by refusing to participate in properly initiated arbitration proceedings." *Id.* at 1011. Simply stated, the *Brown* Court found that one party's refusal to arbitrate in accordance with the contract will therefore excuse the other party from his or her obligation to do so. *Id.*; *see also W.R. Grimshaw Co. v. Nazareth Literary & Benev. Inst.*, 113 F.Supp. 564 (E.D. Ark. 1953); 6 C.J.S. Arbitration § 17.

Plaintiff's reliance on *Brown* is misplaced. Unlike in *Brown*, the Defendants here did not refuse to arbitrate and thereinafter move to compel arbitration in this Court. Rather, evidence suggests that Defendants attempted to invoke, not repudiate, the arbitration clause in the Contract. *See* Doc. 13-1 (March 4, 2016 email from Brad Williams to Chris Healy: "The [engagement] letter also provides for a procedure in the event of a disagreement over the

---

[16] It should be noted that the Defendants have not asserted a malpractice claim in this action, nor does the record reflect an ethics complaint to any authority.

fees[.]"); Doc. 11-2 (June 28, 2016 letter from Edward Sheu to Mark Meierhenry: "Your firm's representation . . . is governed by the Attorney Fee Contract . . . with any disagreement [about the fee] to be decided by a panel of three professionals (two selected by the Williamses, one by your firm, and with your firm being bound by their majority decision) . . . ."). Therefore, the sole issue becomes whether Defendants' statements that they would not perform under the Contract, *i.e.* would not pay the contingent fee, and the threats of malpractice and ethics violations claims, acted as a repudiation of the arbitration clause.

Generally, courts have allowed or ordered arbitration even where there has been a breach of the underlying contract. *See Drake Bakeries, Inc. v. Local 50, Am. Bakery & Confectionery Workers Int'l, AFL-CIO*, 370 U.S. 254, 263 n.10 (1962) (citing 6 Corbin, Contracts § 1443) (finding that "mere nonperformance [of other provisions in the contract] . . . is not per se 'repudiation' [of an arbitration agreement]."); *see also* 6 C.J.S. Arbitration § 17 ("[A] breach of the underlying agreement is not a repudiation of its arbitration provision . . . ."). This concept was demonstrated most notably in the Supreme Court case of *Drake Bakeries*. In *Drake Bakeries*, after a union strike, the bakery filed an action for breach of the no-strike provision and the union filed a motion to stay and compel arbitration in accordance with the collective bargaining agreement. *Id.* at 256. The District Court granted the motion and the bakery appealed. *Id.* at 255. On appeal to the Supreme Court of the United States, the bakery argued, in part, that "even if it agreed in the contract to arbitrate union violations of the no-strike clause, it is excused by the union's breach from pursuing the post-breach remedies called for in the contract." *Id.* at 260. The Supreme Court disagreed and found that "[a]rbitration provisions, *which themselves have not been repudiated*, are meant to survive breaches of contract, in many contexts, even total breach; and in determining whether one party has so repudiated his promise to arbitrate that the other party is excused[,] the circumstances of the claimed repudiation are critically important." *Id.* at 262-63 (emphasis added).

In a case denying arbitration of attorney fees, a 1940s New York court found that where an attorney was discharged from his contract of employment, which provided for arbitration in the event that a reasonable fee for his services could not be agreed on, but which further provided that the fee was to be derived only from assets recovered upon the successful termination of the action, it was held that the discharge of the attorney by the petitioners before the termination of the action left no basis for the determination of the fee as provided in the contract of

employment, and further, that the petitioners, having repudiated the contract, were not entitled to proceed thereunder, the petitioners' motion for an order directing arbitration being therefore denied. *See Application of Tully*, 24 N.Y.S.2d 638 (N.Y. Spe. Term 1940), *aff'd*, 24 N.Y.S.2d 727 (N.Y. App. Div. 1940). In the present case, by contrast, there is a basis for determination of the attorney fees in arbitration.

The facts in the present case are similar to the facts in *Drake Bakeries*. Here, while the Defendants refused to pay the contingent fee, and subsequently threatened to assert malpractice and ethics violations claims against Plaintiff, Defendants did not repudiate the arbitration provision, and as the *Drake Bakeries* Court established, "[a]rbitration provisions . . . are meant to survive breaches of contract . . . even total breach[es]." *Drake Bakeries, Inc.*, 370 U.S. at 262-63. The present case appears to be a total breaching by Defendants of the contingent fee Contract but despite that total breach there is no repudiation of the arbitration clause itself. However, some courts have found that "'[there is] nothing shocking or repugnant to law in one business man saying to another that he regrets to find himself unable to [perform] under a contract between them and at the same time asking the other to join with him in a reference under an arbitration clause in their contract . . . .'" *New Linen Supply v. E. Envtl. Controls, Inc.*, 158 Cal. Rptr. 251, 254 (Cal. Ct. App. 1979) (quoting *Heyman v. Darwins, Ltd.*, (1942) A.C. 356, 373-75). That is not the present situation, as Defendants were able to perform but did not wish to.

Aside from that distinction, courts have observed that contractual violations, and subsequent disputes, frequently encompass the very sort of matter that the arbitration clause in the contract was designed to consider. *See, e.g., Nolde Bros. v. Local No. 358, Bakery & Confectionery Workers Union, AFL-CIO*, 430 U.S. 243, 252 (1977) (finding that "the parties' obligations under their arbitration clause survived contract termination when the dispute was over an obligation arguably created by the expired agreement."). Similarly, the Defendants' refusal to pay the contingent fee was a "disagreement . . . about the termination fee . . . ."[17] and thus encompassed by the arbitration provision in the Contract.

Therefore, the Court concludes that Defendants' refusal to perform under the Contract did not act as a repudiation of the arbitration clause itself. Rather, this attorney fee dispute was one of the various issues contemplated by the "Fee on Termination" clause.

---

[17] *See* Compl., Exh. B, ¶ 4 (Attorney Fee Contract).

11

Plaintiff requests that there be no arbitration and that this litigation continue. The Court has explained above that the dispute will go to arbitration. In the alternative, Plaintiff requested an alternative "alternative dispute resolution" method. As explained above, the FAA applies and the Court has no authority to create yet another arbitration procedure. Various courts have held that a party may not avail itself of a favorable aspect of the contract and then disavow a non-favorable aspect. *See Ricketts v. First Trust Co. of Lincoln, Neb.*, 73 F.2d 599, 602 (8th Cir. 1934) (finding that "he who seeks equity must do equity, and that one may not accept the benefits and repudiate the burdens of his contract."); *Power Sys. & Controls, Inc. v. Schneider Elec. USA, Inc.*, 2010 WL 2384537, at *3 (E.D. Va. June 9, 2010) ("Applying the principle that a party may not avail itself of one aspect of a contract and disavow another aspect of the contract in order to avoid its consequences, particularly an arbitration clause, the Court finds that Plaintiff must abide by the arbitration clause."). Here, in its Complaint, Plaintiff seeks the sum of $216,305.81 plus tax and interest, a figure calculated by using the fee clause in the Contract. As the cases cited above demonstrate, however, Plaintiff cannot seek to enforce those contractual rights to a contingent fee, despite the strong contract renunciation by Defendants, and avoid the Contract's fee arbitration requirement.

## IV. CONCLUSION

The Court finds that a valid arbitration agreement still exists even though Defendants repudiated the contingent fee Contract after the Contract had been substantially performed. The dispute thus falls within the scope of a valid agreement to arbitrate as to the appropriate fee. This case is stayed pursuant to the provisions of Section 3 of the FAA. Therefore, IT IS ORDERED that Defendant's motion to stay and compel arbitration, Doc. 7, is granted.

Dated this 1st day of May, 2017.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: _____
DEPUTY